**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| LIFT TRUCK LEASE AND SERVICE, INC., | ) |
| d/b/a A.D. LIFT TRUCK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )          No. 4:12-CV-153 CAS |
| | ) |
| NISSAN FORKLIFT CORPORATION, | ) |
| NORTH AMERICA, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This diversity matter is before the Court on defendant Nissan Forklift Corporation, North America's ("Nissan") motion to exclude the testimony of plaintiff's expert witness Ron Schuster pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Plaintiff Lift Truck Lease and Service, Inc., d/b/a A.D. Lift Truck ("ADL") opposes the motion and it is fully briefed. No party has requested an evidentiary hearing, and the parties have submitted an evidentiary record including exhibits and deposition testimony.  The Court finds that it can make a proper Daubert analysis without the need for an evidentiary hearing or oral argument.  For the following reasons, Nissan's motion will be granted in part, denied in part, and denied in part as moot.

**Background**

This case arises out of a business relationship between ADL and Nissan.  ADL is a dealer of new and used lift trucks (forklifts) and other industrial transportation equipment, and supporting parts and service.  Nissan manufactures lift truck and other industrial transportation equipment under the Nissan Forklift and Barrett Industrial Trucks marks, which equipment is resold through a nationwide network of dealers.

In January 2010, the parties entered into three agreements, under which Nissan appointed ADL as the exclusive authorized dealer of Nissan Forklift products in certain counties in Illinois and Missouri.  The agreements included a Nissan Forklift Dealer Term Sales and Service Agreement (the "Term Agreement") which expired by its terms as of February 1, 2012.  The agreements imposed certain performance obligations and sales goals on ADL.  On January 10, 2012, Nissan sent a letter to ADL giving notice of its intent not to renew the Term Agreement and to allow it to expire as of February 1, 2012 (the "Notice Letter").  The Notice Letter asserted that ADL was in default of its obligations with respect to three sections of the Term Agreement.  The Notice Letter stated that it was a "90-day notice of non-renewal and termination," and that ADL "will no longer be a Nissan or Barrett Dealer as of 4/15/12."  The Notice Letter also stated that if ADL cured the default by achieving specific target goals within 60 days of the date of the letter, "the non-renewal and termination will not go into effect and [Nissan] will offer [ADL] a new 12-month Term Agreement." Id.

ADL filed this action after receiving the Notice Letter.  In the single remaining claim, ADL alleges that Nissan violated the Missouri Power Equipment Act, § 407.753, Mo. Rev. Stat. (2000) (the "Act"), by terminating the agreements between the parties without good cause.

**Legal Standard**

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702.  In Daubert, the United States Supreme Court interpreted Rule 702 to require district courts to be certain that expert evidence based on scientific, technical or other specialized knowledge is "not only relevant, but reliable."  Daubert, 509 U.S. at 589.  The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid

2

and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert at 592-93.

The Eighth Circuit Court of Appeals has stated that proposed expert testimony must meet three criteria to be admissible under Rule 702. "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). "Second, the proposed witness must be qualified to assist the finder of fact." Id. (citation omitted). "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." Id. To meet the third requirement, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods;" and the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d).

The Eighth Circuit has explained that "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999), and "favors admissibility if the testimony will assist the trier of fact." Clark ex rel. Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Id. (citation and internal quotation omitted).

As a general rule, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Nebraska Plastics, Inc. v. Holland Colors Am., Inc., 408 F.3d 410, 416 (8th Cir. 2005) (quoted case omitted). However, "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." Id.

3

(quoted case omitted).  An expert opinion is fundamentally unsupported when it "fails to consider the relevant facts of the case."  Id.

**Discussion**

ADL disclosed Mr. Schuster as an expert witness.  Mr. Schuster retired in 2010 after a thirty-eight year career in the material handling business.  During his career, Mr. Schuster worked in a variety of sales and managerial capacities for forklift and construction equipment dealers and manufacturers in different parts of the United States, including over twenty years with forklift manufacturer Allis-Chalmers, where he was a branch manager, vice president and general manager, and finally its Western Region District Sales Manager/Dealer Development, and concurrently served as the General Manager of both its Oakland, California and Seattle, Washington branch offices, operating Allis-Chalmers' factory-owned dealerships, "specifically poor financial performers in an effort to either turn the company around or sell it."  Report of Ron Schuster at 4.  Mr. Schuster subsequently worked for forklift manufacturers Kalmar AC as a branch manager and NACCO Material Handling Group as a regional sales manager.  Mr. Schuster also worked for forklift dealers in Arkansas, California, Texas and Kansas for over ten years in various capacities, including customer service salesman, branch manager, product support manager, acting general manager, and vice president of operations.

In his expert report, Mr. Schuster opined that (1) ADL substantially achieved the sales goals set forth in the parties' Term Agreement; (2) Nissan treated ADL differently than similarly situated dealers; and (3) Nissan's termination of ADL did not conform to forklift industry custom and practice.

Nissan seeks the exclusion of these opinions, arguing that the sales goal opinion fails to take into consideration "a plethora of relevant facts" that contradict it; the differential treatment opinion

4

is inadmissible because Mr. Schuster provides no methodological basis for it; and the industry custom and practice opinion is irrelevant because the Act does not require a termination to conform to industry custom and practice, and Mr. Schuster provides no reasonable basis for the opinion which is based "solely on personal experience and anecdotal evidence from decades prior."  Mot. to Exclude at 2.[1]

     1.  *Mr. Schuster May Testify that ADL Substantially Achieved its Sales Goals*

Nissan moves to exclude Mr. Schuster's opinion that ADL substantially met its sales goals on the basis that the testimony lacks a factual foundation.  Nissan also contends that Mr. Schuster did nothing to examine the data upon which his opinion is based, and merely adopted ADL's version of the factual background.  Nissan asserts that it is undisputed ADL failed to meet at least five out of six goals during the course of its two-year term as a dealer, and although the parties' agreements specify three important goals, Mr. Schuster relied on only one set of goals – market share for Class I, IV and V forklifts – to opine that ADL's performance was close enough to the goal to say it substantially met the goal for 2011.  Nissan states that Mr. Schuster admitted in deposition testimony ADL did not meet any of the three goals for 2010, and failed to meet the two other goals – market share for Class II and III forklifts, and parts purchases – for 2011.  Thus, Nissan contends that Mr. Schuster's opinion is not the product of sufficient facts or data, or the product of reliable principles and methods, and should be excluded.

---

[1]Nissan also moves to exclude Mr. Schuster's opinions as to (1) interpretation of any agreement between ADL and Nissan; (2) interpretation of any Missouri statute; (3) whether or not there was a "meeting of the minds" as to sales goals; (4) St. Louis market conditions; and (5) the preparation of ADL's sales goals.  ADL responds that Mr. Schuster will not be offering opinions on these topics and consents to entry of an order prohibiting testimony on these issues.  Based on ADL's representation that it does not intend to introduce Mr. Schuster's testimony on these issues, the Court will instead deny this aspect of Nissan's motion to exclude as moot.

ADL responds that Mr. Schuster's expert opinion is that ADL substantially achieved its 2011 sales performance goal for the most important categories of products in the forklift industry – Class I, IV and V forklifts – as the term "substantially" is understood in the industry.  ADL states that Mr. Schuster testified his opinion was based on his review of Nissan's own reports of dealer sales performance, which track actual sales results and have been accepted by both parties to this case as ADL's true performance results as a Nissan dealer.  Thus, ADL contends that Mr. Schuster's opinion meets the third <u>Lauzon</u> requirement because the numbers underlying the opinion are reliable and trustworthy in an evidentiary sense.

ADL asserts that Mr. Schuster's opinion also meets the first and second <u>Lauzon</u> requirements, as the ultimate issue to be decided by the jury in this case is whether Nissan had "good cause" to terminate ADL as a dealer under the Act.  The Act provides that a manufacturer, wholesaler or distributor of industrial, maintenance or power equipment shall not terminate, cancel or fail to renew a contract with a retailer in the business of selling such equipment that maintains a stock of parts or machines, without "good cause."  <u>See</u> 407.753.1.  The Act defines "good cause" as follows:

> "Good cause" means failure by the retailer to <u>substantially comply</u> with essential and reasonable requirements imposed upon the retailer by the contract if such requirements are not different from those requirements imposed on other similarly situated retailers either by their terms or in the manner of their enforcement.

407.753.1, Mo. Rev. Stat. (emphasis added).

ADL states that because neither the statute nor any case law offers guidance as to the meaning of the term "substantially comply," the jury will be aided by an understanding of the custom and practice of the material handling industry, and specifically what industry veterans such as Mr. Schuster understand the term "substantially comply" to mean in this context.  ADL asserts

that because Mr. Schuster possesses specialized knowledge based on his years of experience in the industry, and because it will assist the fact finder in deciding the ultimate issue in the case, his opinion on this issue also satisfies the first and second <u>Lauzon</u> requirements.

Nissan's objection concerns the factual basis of Mr. Schuster's opinion testimony. As such, the objection goes to the credibility of the testimony, not its admissibility. See <u>Nebraska Plastics</u>, 408 F.3d at 416. Mr. Schuster's opinion is based on his review of Nissan's Southwest Region Dealer Sales Results data, in which ADL was located, and therefore does not fail to consider the relevant facts of the case. <u>See id.</u> The fact that Mr. Schuster draws different conclusions from the data than Nissan does, and concludes that one category of sales is significantly more important than the others, is a basis for cross examination rather than exclusion.

Mr. Schuster's extensive experience working in the forklift industry for both dealers and manufacturers gives him specialized knowledge and experience that provides a sufficient basis to provide expert testimony on this issue. <u>See</u> Rule 702, Fed. R. Evid. (expert may be qualified by "knowledge, skill, experience, training, or education"). Because there is no legal authority interpreting the Act's good cause standard or the term "substantially comply," Mr. Schuster's testimony should assist the jury in this case. As stated above, Rule 702 "favors admissibility if the testimony will assist the trier of fact." <u>Clark</u>, 150 F.3d at 915. Nissan's motion to exclude Mr. Schuster's opinion concerning ADL's success in meeting its sales goals should therefore be denied.

2. *Mr. Schuster May Testify that Nissan Treated ADL Differently than Similarly Situated Dealers*

Nissan moves to exclude Mr. Schuster's opinion testimony that Nissan treated ADL differently than similarly situated dealers, asserting that the testimony is based on incomplete and flawed methodology in selecting comparative dealers, and that his opinion of differing treatment is

conclusory and unreliable.  Nissan states that Mr. Schuster offered several different interpretations of the term "similarly situated," at one point testifying that similarly situated dealers are in the same location, later that similarly situated dealers are those in Nissan's Southwest Region, and finally that the determination of whether dealers are similarly situated depends on the dealers' market size, although some dealers in the Southwest Region are not in similarly-sized markets.  Nissan asserts that none of Mr. Schuster's selection methods include important considerations such as the length of the dealer's relationship with the supplier, whether the dealer is new or has been in the market for some length of time, and what type of agreement the dealer has with the supplier, i.e., whether it is a new dealer with a Term Agreement.

Nissan contends that Mr. Schuster randomly selected four dealers from a Nissan Southwest Region performance report to create the argument that ADL was treated differently from those dealers, and that his methodology is incomplete and flawed because he did not evaluate the dealers' performance across all three relevant categories of goals, but only considered their market share performance in one category – market share for Class I, IV and V forklifts – and did not consider whether any of the four dealers were new dealers on Term Agreements, the type of agreement that set forth ADL's goals.

ADL responds that Mr. Schuster's opinion concerning differential treatment is based on his review of Nissan's own reports of actual dealers sales results in the Southwest Region, and therefore it is reliable and trustworthy in an evidentiary sense.  ADL also asserts that Mr. Schuster is qualified to opine about Nissan's treatment of ADL as compared to similarly situated dealers in terms of market penetration and dealer requirements, based on his many years of experience in the material handling industry working for both dealers and manufacturers, and his general understanding of Nissan's relationship with customers in the marketplace gained from that experience.

Finally, ADL asserts that Mr. Schuster's opinion will be helpful to the jury because the Power Equipment Act's definition of "good cause" for dealer termination uses similarly situated dealers as a reference point for determining whether good cause exists:

> "Good cause" means failure by the retailer to substantially comply with essential and reasonable requirements imposed upon the retailer by the contract if such requirements are not different from those requirements imposed on other <u>similarly situated retailers</u> either by their terms or in the manner of their enforcement.

407.753.1, Mo. Rev. Stat. (emphasis added).  ADL states that because neither the statute nor any case law offers guidance as to the meaning of the term "similarly situated," the jury will be aided by an understanding of the custom and practice of the material handling industry, and specifically what industry veterans such as Mr. Schuster understand "similarly situated" to mean with respect to market penetration, dealer requirements, and the difference between market share goals, achieved goals, and sales results.  ADL asserts that because Mr. Schuster possesses specialized knowledge based on his years of experience in the industry, his opinion will assist the fact finder in deciding the ultimate issue in the case.

Nissan's objections again concern the factual basis of Mr. Schuster's opinion testimony.  As such, the objections go to the credibility and weight of the testimony, not its admissibility.  <u>See</u> <u>Nebraska Plastics</u>, 408 F.3d at 416.  Mr. Schuster's opinion is based on his review of Nissan's Southwest Region Dealer Sales Results data, and therefore does not fail to consider the relevant facts of the case.  <u>See id.</u>  Nissan's points regarding Mr. Schuster's criteria for selection of certain dealers as similarly situated to ADL, differing explanations as to which dealers were similar, focus on one category of sales to the exclusion of others, and failure to consider the nature of each dealer's agreement with Nissan, are all grounds for cross examination rather than exclusion.

Mr. Schuster is qualified to offer the opinion based on his specialized knowledge and experience with both dealers and manufacturers in the forklift industry.  Because there is no legal authority interpreting the Act's "good cause" standard or its use of the term "similarly situated," Mr. Schuster's testimony should assist the jury in this case.  Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility."  Clark, 150 F.3d at 915 (citation and internal quotation omitted).  Nissan's motion to exclude Mr. Schuster's opinion that Nissan treated ADL differently than similar situated dealers should therefore be denied.

3. *Mr. Schuster May Not Testify that Nissan's Termination of ADL Did Not Conform to Forklift Industry Custom and Practice*

Finally, Nissan moves to exclude Mr. Schuster's opinion testimony that Nissan's termination of ADL did not conform to forklift industry custom and practice.  Nissan contends that Mr. Schuster fails to provide a reasonable basis for this opinion, and relies solely on personal experience and anecdotal evidence from decades prior.  Nissan also asserts that the opinion is irrelevant because the Power Equipment Act does not require a dealer termination to follow industry custom and practice.

Nissan states that Mr. Schuster's opinion fails to consider any facts relevant to the notice and opportunity to cure provisions in the Power Equipment Act, and that his testimony showed he does not know how much notice ADL was given, how much time ADL was given to cure its deficiencies, or whether it even tried to cure; and he also acknowledged that the filing of this lawsuit could have made it harder to ADL to cure.  Nissan asserts that Mr. Schuster's industry experience is unrelated to this issue, because he does not remember interacting with any "new" dealers that could be compared to ADL; cannot identify any manufacturers he worked for that used a term agreement for new dealers, as Nissan does; and merely testifies that it is highly unusual to terminate a dealer after two years.  Nissan also asserts that the industry experience Mr. Schuster relies on for this opinion

10

is from the early 1980s, well before the Missouri legislature enacted the Power Equipment Act containing rules regarding termination of dealers that equipment manufacturers must now follow. Finally, Nissan contends that Mr. Schuster's opinion creates a legal duty that does not exist, because the Act does not require manufacturers to follow industry custom and practice in terminating a dealer.  Nissan asserts that his testimony is not only unhelpful to the jury, but would also mislead the jury into thinking there was such a duty.

ADL responds that Mr. Schuster's opinion is that Nissan "blind sided" ADL by failing to warn that its sales performance was inadequate, and that termination of the parties' relationship was imminent or likely.  ADL states that Mr. Schuster's opinion is based on his thirty-eight years of combined experience in the forklift industry, and on his review of the correspondence between the parties relating to termination.  Thus, ADL asserts that his opinion is based on reliable facts, because it is based on the parties' actual communications, and notes that Nissan's representatives have testified that they did not warn ADL that its sales performance was lacking in 2011 or that it was in danger of being terminated as a dealer.  Thus, ADL contends that Mr. Schuster's opinion is reliable in the evidentiary sense and satisfies the third <u>Lauzon</u> requirement, and that any dispute as to the factual basis of the opinion goes to its credibility, not its admissibility.

ADL contends that Mr. Schuster's industry experience gives him specialized knowledge to explain the typical procedure utilized by manufacturers when a dealer is struggling, and asserts that his opinion will assist the jury in determining whether Nissan had "good cause" to terminate it under the Power Equipment Act.  ADL argues that Nissan's failure to warn of its performance deficiencies tends to suggest that Nissan did not have good cause to terminate, but rather was motivated by other factors.

11

As previously stated, Mr. Schuster testified to his thirty-eight years of experience in the forklift industry with both dealers and manufacturers, including working with struggling dealers from the manufacturers' side.  Mr. Schuster testified that he could not, however, identify any dealership that was a new dealership during the period he worked for NACCO and did not remember interacting with any new dealers through NACCO; he did not know whether NACCO put its new dealers on a term agreement, as opposed to a standard agreement; he testified that to his knowledge, Allis-Chalmers put all of its dealers on the same standard agreement until it went bankrupt in 1985; he had not read Toyota Forklift's dealer agreements and did not know whether Toyota had a custom and practice of putting new dealers on a term agreement; he did not remember the Crown dealer agreements; he testified he did not know anything about Mitsubishi, Doosan or TCM dealer agreements; and he testified he could not name any manufacturer that has a custom and practice of allowing a new dealer on a term agreement to continue if the dealer does not meet any of its goals in the first two years.  Schuster Dep. at 158-163.  Mr. Schuster testified his opinion that the ADL termination did not conform to industry custom and practice was based on his experience "that there has been some communication between the manufacturer and its dealer prior to termination.  So – and there could be a practice, some people could do anything.  So I'm saying that, based on my 38 years, I've not seen it."  Schuster Dep. at 163-64.

When asked on cross examination whether he reviewed Nissan's letter to ADL of January 10, 2012 in forming his opinions,[2] Mr. Schuster stated that he had; and when asked if he relied on

_____

[2]As the Court found in the Memorandum and Order on Nissan's motion for summary judgment,

On January 10, 2012, Nissan sent a letter to ADL giving notice of its intent not to renew the Term Agreement, and to allow it to expire as of February 1, 2012 (the "Notice Letter").  The Notice Letter asserted that ADL was in default of its

the letter in forming his opinions, Mr. Schuster stated, "Well, it was part of it.  Let's see, I think that's where I got that dealer achieved 6.2%, Class 1, 4, and 5.  That's where I got that 6.2 number."  Schuster Dep. at 196.  Mr. Schuster did not testify that he considered the January 10, 2012 letter in determining whether Nissan had complied with forklift industry custom and practice.

Based on the foregoing, the Court finds Mr. Schuster's opinion is based on insufficient facts to be the product of reliable principles and methods, and would not assist the jury in understanding the evidence or determining a fact in issue.  See Rule 702(b)-(d), Fed. R. Evid.  Mr. Schuster's experience is unrelated to the facts of this case, where a forklift manufacturer and dealer entered into a term franchise agreement that included specific goals and a termination date, and where termination of the agreement is subject to limits and restrictions imposed by a statute.  Mr. Schuster did not testify that he had any knowledge of forklift industry custom and practice in this context.  Mr. Schuster's review of the January 10, 2012 notice letter is insufficient to provide an adequate factual basis for his opinion.  The Court finds that Mr. Schuster's experience does not bear a close enough relationship to his opinion to provide a sufficient basis for it.  See Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009) ("for an expert witness to be qualified based on experience,

---

obligations with respect to three sections of the Term Agreement.  The Notice Letter also gave notice of Nissan's intent to terminate the Barrett Agreement because ADL "has not provided adequate sales coverage as outlined in Section 11(a)."  The Notice Letter stated, "This letter is your 90-day notice of non-renewal and termination for both Agreements and [ADL] will no longer be a Nissan or Barrett Dealer as of 4/15/12."  The Notice Letter also stated that if ADL cured the default by achieving specific target goals within 60 days of the date of the letter, "the non-renewal and termination will not go into effect and [Nissan] will offer [ADL] a new 12-month Term Agreement."  Id.

Mem. and Order of June 12, 2013 at 2 (Doc. 92).

that experience must bear a close relationship to the expert's opinion."). Therefore, the opinion does not meet the third <u>Lauzon</u> requirement and may not be allowed into evidence.

The Court also finds that Mr. Schuster's opinion concerning forklift industry custom and practice is irrelevant to the issues presented in this case and would not be useful to the jury in deciding the ultimate issues of fact. This is because the Power Equipment Act does not mention industry custom and practice and does not require a power equipment manufacturer to comply with industry custom and practice in terminating a dealer. The Act requires that a manufacturer have "good cause" to terminate a dealer, as that term is defined in the Act, and that is what the jury must determine in this case. As such, the opinion also does not meet the first <u>Lauzon</u> requirement.

Nissan's motion to exclude Mr. Schuster's opinion that its termination of ADL did not conform to forklift industry custom and practice should therefore be granted.

**Conclusion**

For the foregoing reasons, Nissan's motion to exclude the opinions and testimony of plaintiff ADL's expert witness Ron Schuster pursuant to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), should be granted in part, denied in part, and denied in part as moot.

Accordingly,

**IT IS HEREBY ORDERED** that Nissan Forklift Corporation, North America's motion to exclude the testimony of plaintiff Lift Truck Lease and Service, Inc., d/b/a A.D. Lift Truck's expert witness Ron Schuster is **GRANTED in part**, **DENIED in part**, and **DENIED in part as moot**; the motion is:

**GRANTED** as to Mr. Schuster's opinion that Nissan's termination of ADL did not conform to forklift industry custom and practice;

14

**DENIED** as to Mr. Schuster's opinions that (1) ADL substantially achieved its sales goals, and (2) Nissan treated ADL differently than similarly situated dealers; and

**DENIED as moot** as to Mr. Schuster's opinions concerning (1) the interpretation of any agreement between ADL and Nissan; (2) the interpretation of any Missouri statute; (3) whether or not there was a "meeting of the minds" as to sales goals; (4) St. Louis market conditions; and (5) the preparation of ADL's sales goals, based on ADL's representation that it will not introduce Mr. Schuster's testimony on these issues.  [Doc. 66]


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this  21st  day of June, 2013.

15